OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Austin

GERALD C. MANN
Attorney General


Honorable J. W. Calhoun
Comptroller of The University of Texas
Austin, Texas

Dear Sir:

overruled by O-1861

Opinion No. O-1577
Re: Construction of tax exemption laws re-
lative to property held by the Board of
Regents of The University of Texas, in
Trust, for the use of the University
for specified purposes.

We acknowledge receipt of your request for an
opinion on whether or not certain property conveyed to the
Board of Regents of The University of Texas by George Beggs,
as Executor and Trustee under the will of Edward Disney
Farmer, deceased, and by Mike Hogg, as Independent Executor
of the estate of W. C. Hogg, deceased, et al, is exempt
from taxation.

On December 30, 1938, George Beggs, as Executor
and Trustee under the will of Edward Disney Farmer, deceas-
ed, conveyed to the Board of Regents of The University of
Texas for the use and benefit of The University of Texas,
certain land in the City of Fort Worth. The title and pos-
session of The University of Texas to this property was
confirmed by a decree of the 126th District Court, Travis
County, Texas, on May 31, 1939, in Cause No. 61,847, styled
State of Texas et al v. George Beggs.

At the First Called Session of the 41st Legisla-
ture, Chapter 25, p. 59 of the Acts thereof, the Legislature
established the "E. D. Farmer International Scholarship Fund,"
and provided that it should be administered by the Board of
Regents of The University of Texas.

The Act of the Legislature establishing the "E.
D. Farmer International Scholarship Fund" provided that the
fund should be used for the purpose of providing scholarships
in The University of Texas to students from the Republic of
Mexico, and providing scholarships in the National University
of Mexico to students of The University of Texas.

The property conveyed by said Geroge Beggs is now rented by the Board of Regents for garage purposes, and the revenue therefrom is placed to the credit of the "E. D. Farmer International Scholarship fund."

The property conveyed by Mike Hogg, as Independent Executor of the estate of W. C. Hogg, deceased, et al, consists of real estate, mineral rights, oil royalties, bonds, notes, shares of stock and other property which constituted the residue of the estate of W. C. Hogg, deceased.

The will of W. C. Hogg, deceased, provided that such residue would be conveyed to:

"The Board of Regents of The University of Texas, so that said Board of Regents may devote all or as much of it as may be necessary to the endowment, establishment and maintenance of a lecture fund aimed to secure the services of men of proved learning to deliver courses or random lectures on the history, literature, art and social and political experience of mankind. The controlling purpose of this foundation should be to insure an opportunity to the University and the people of Texas for knowing what the real achievements and past experience of mankind have been. To this end, the lecturers retained by said foundation may, in the discretion of the authorities of the University, and as the income of the foundation may permit, deliver their respective addresses on invitation at any educational institution, public library, town hall, public art institute, public auditorium, etc., within the State of Texas, provided no admission be charged. I especially request that, at least during the first three to five years of this foundation, mark attention and emphasis be given by retained lecturers of national ability and reputation to the value and service of education and the duty and obligation of our commonwealth and all its divisions, to establish, equip and support adequately, if not par excellence, all needed education facilities in keeping with the dignity and aspiration of our great State."

When the Constitution of Texas was adopted, the people of the State provided for the establishment of The

University of Texas by the adoption of Article 7, Section 10 thereof.

The Constitution also provided for the establishment and maintenance of a system of free public schools by the adoption of Section 1, Article 7, and used the phrase "a general diffusion of knowledge being _essential_ to the preservation of the liberties and rights of the people," thereby recognizing that the education of the masses was a function of State Government. Within nine years after the adoption of the Constitution, the Supreme Court recognized that education was a governmental function in the case of Cassiano v. Ursuline Academy, 64 Tex. 673.

The University of Texas is a department of the State Government created for the purpose of education. Mumme vs. Marrs, 40 S. W. (2d) 31, and Oklahoma A. & M. College v. Miller, 52 Pac. 921. And in the case of Cochran v. Cavanaugh, 252 S. W. 248, Chief Justice Jones said:

"The State University is a public institution authorized by the Constitution of the State of Texas..."

The University of Texas was established by the Act of 1881 (Ch. 75, Acts Regular Session, 17th Leg.), and is under the control of the Board of Regents by an Act of the Legislature, and said Board derives all of its powers and duties from the Legislature of Texas. Article 2584 et seq. These officers are State officers. As stated in the celebrated case of Dartmouth College v. Woodward, Chief Justice Marshall used the following language:

"That education is an object of National concern, and a proper subject of legislation, all admit. That there may be an institution founded by the Government and placed entirely under its immediate control, the officers of which would be public officers, amenable exclusively to the government, none will deny."

In the case of Splawn vs. Woodward, 287 S. W. 667, Chief Justice McClendon says:

"The regents are clearly officers of the state charged with the duty of management and control of the University and its properties."

It is, therefore, our opinion that The University of Texas is a department of the State of Texas and it is operated for the use and benefit of the public and that its Board of Regents are State officers.

The two groups of property with which we are here concerned were conveyed to the Regents of The University of Texas for the uses and benefits stated in the deeds. The property thereby became public property, and the trustees are agents of the State for the administration of the properties and funds in the manner in which the donor decreed.

On November 8, 1932, Section 11 of Article 7 of the Constitution of Texas was adopted. Said Section provides in part as follows:

"In order to enable the Legislature to perform the duties set forth in the foregoing section, it is hereby declared all land and other property heretofore set apart and appropriated for the establishment and maintenance of the University of Texas, ... and all grants, donations, and appropriations that may hereafter be made by the State of Texas, or from any other source, except donations limited to specific purposes, shall constitute and become a Permanent University Fund." (Emphasis ours)

It will be noted that property donated to The University of Texas for specific purposes does not become a part of the Permanent University Fund, and therefrom we conclude that the two groups of property with which we are here concerned do not constitute a part of such fund.

Article 2596, Vernon's Annotated Civil Statutes, authorizes the Board of Regents to accept land in trust for educational purposes, and provides that the donors may declare the directions, limitations, and provisions of the uses and administration of such funds so long as the same are not inconsistent with the objects and proper management of The University of Texas.

On November 4, 1930, Section 16a of Article 7 of the Constitution of Texas was adopted, and provided that all land mentioned in Sections 11, 12 and 15 of Article 7 now belonging to The University of Texas should be subject to taxation for county purposes; but it will be noted that the provision only applies to land held by the University

of Texas on November 4, 1930. The land with which we are now concerned was not acquired until December 30, 1938, and July 1, 1939, respectively, and would not be subject to taxation for county purposes under that section of the Constitution.

Article 8, Section 2, of the Constitution provides that "the Legislature may, by general laws, exempt from taxation public property used for public purposes." Pursuant thereto, the Legislature passed Article 7150, Vernon's Annotated Civil Statutes. Section 4 thereof provides that "all property, whether real or personal, belonging exclusively to the state or any political subdivision thereof" shall be exempt from taxation.

The Legislature, when it passed Article 7150, apparently overstepped the bounds of its power when it did not limit the exemption to "property used for public purposes," for Justice Funderburk, in the case of City of Abilene v. State, 113 S.W. (2d) 631 (writ of error dismissed), said:

"It is quite apparent that the exemption declared in said Article 7150 is more comprehensive than the power which the Legislature possessed. The purport of the statute is broad enough to exempt public property regardless of its use. This the Legislature was expressly denied the power to do. But it does not follow, we think, that the statute is for that reason wholly inoperative. We see no reason why it may not be operative, as an exercise of all the power the Legislature has, to declare the exemption. The declared exemption includes public property used for public purposes, and to that extent, we think, the statute valid and operative."

We must, therefore, determine whether or not the property in question is "used for public purposes," as we have heretofore determined that it is public property.

The case most nearly in point on the question of "use for public purposes" is that of Corporation of San Felipe de Austin v. State, 229 S.W. 845. In that case the State attempted to subject to taxation land belonging to the municipality of San Felipe de Austin, granted that

town by the Mexican Government in 1824, for the use of the
inhabitants for timber and grazing land, which grant was
confirmed by the Republic of Texas in 1837. The land was
used for grazing and for timber by the inhabitants. The
grant provided that the land could not be sold or rented
until all of the useful timber had been cut. This timber
was used for firewood. In other words, the use of the
grass and timber was a revenue from the land just as is the
income and revenue from the property here under discussion.
Chief Justice Phillips held that the land was "used for
public purposes." He also said:

"The Constitution exempts from taxation the
property of municipalities devoted exclusively
to the use of the public. The municipalities are
political subdivisions of the state. To tax
their property devoted to public use but amounts
to the state taxing itself. It is therefore not
taxable."

To say that the property itself is taxable and the
revenues are exempt is a mere absurdity, for the taxes
would have to be paid out of the revenues or out of funds
appropriated by the Legislature for that purpose.

In the case of Galveston Wharf Company vs. Galves-
ton, 63 Tex. 14, the company sought to enjoin the sale of
certain property for taxes. The company had possession
and the injunction was sought on the ground that one-third
of the property was that of the city, in trust, for its
present and future inhabitants, and was used only for pub-
lic purposes. The city was to receive the dividends from
its share of the profits. The District Court held that
the property was used for public purposes and not taxable.
The Supreme Court upheld the District Court, and Justice
Stayton, in his opinion, said:

"If, however, the decree did not vest in
the city the title to one undivided one-third
of the property of which it purports to dispose,
there can be no doubt that the decree vests in
the city such a beneficial interest in the pro-
perty, and in the dividend to arrive from its
use, as would, on principal, render it improper
for the city to impose taxes which would indirect-
ly deprive it of a part of the dividends, which,
under the decree, it was evidently intended the
city should receive."

"In other words, can a city tax the property
to the extent of its beneficial interest therein,
when to do so would diminish its dividends, and
in addition to this incur the increased expense
of collecting tax?

"In our opinion, it might just as well tax
any other property it owned, and pay the tax out
of its own treasury, with the loss to itself of
the cost of collecting.

"A power to tax, under such circumstances,
involves the power of a municipal corporation to
tax itself, or its own property, which it certain-
ly cannot do, for obvious reasons."

We are of the opinion, that the property conveyed
to the Board of Regents for the use and benefit of The
University of Texas by George Beggs and Mike Hogg, in their
fiduciary capacities, is the property of The University of
Texas, a department of the State, and that it is public
property used for public purposes, and is therefore exempt
from all taxation under the Constitution and laws of the
State.

We sincerely trust that the foregoing fully
answers your inquiry.

Yours very truly

ATTORNEY GENERAL OF TEXAS

By  (Signed)   Richard H. Cooke
Assistant

RHC:pbp

APPROVED DEC 14, 1938

(Signed)  Gerald C. Mann

ATTORNEY GENERAL OF TEXAS